UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAMIEN SHONTELL HEWLETT,

        Plaintiff,

       v.                                         Case No. 22-C-1363

JASON HILL, LT BRYANT,
LT FISCHER, SGT BABCOCK,
SGT DROVER, CO LANGRIDGE,
CO MCGUINESS, and CO RANSBOTTOM,

        Defendants.

---

## SCREENING ORDER

---

Plaintiff Damien Shontell Hewlett, who is currently serving a state prison sentence at Waupun Correctional Institution and representing himself, filed a complaint under 42 U.S.C. §1983, alleging that his civil rights were violated. This matter comes before the Court on Hewlett's motion for leave to proceed without prepaying the full filing fee and to screen the complaint.

### MOTION TO PROCEED WITHOUT PREPAYING THE FILING FEE

Hewlett has requested leave to proceed without prepaying the full filing fee (*in forma pauperis*). A prisoner plaintiff proceeding *in forma pauperis* is required to pay the full amount of the $350.00 filing fee over time. *See* 28 U.S.C. §1915(b)(1). Hewlett has filed a certified copy of his prison trust account statement for the six-month period immediately preceding the filing of his complaint, as required under 28 U.S.C. §1915(a)(2), and has been assessed and paid an initial partial filing fee of $27.47. Hewlett's motion for leave to proceed without prepaying the filing fee will be granted.

## Screening of the Complaint

The Court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, and dismiss any complaint or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, a plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal quotations omitted).

## ALLEGATIONS OF THE COMPLAINT

According to Hewlett, on September 16, 2022, he told Defendant Lt. Fischer that he was going to kill himself. Fischer allegedly asked Hewlett to come to his cell door to cuff up and go on observation status, but Hewlett refused, telling Fischer he was going to kill himself and Fischer could not stop him. Hewlett asserts that Fischer radioed Defendant CO Ransbottom and instructed her to stay at Hewlett's door because he was suicidal. Fischer left and, according to Hewlett, Ransbottom began to talk to him. Hewlett explains that he told her he was going to end his misery by taking all the Tylenol he had. Hewlett asserts that Ransbottom briefly left his cell to respond to another inmate who was calling her, at which time Hewlett swallowed a handful of Tylenol. Dkt. No. 1 at 2-3.

Soon thereafter, Ransbottom, Defendant Lt. Bryant, and Fischer all came to Hewlett's cell and tried to convince him to come out, but Hewlett refused. According to Hewlett, Fischer called a five-man extraction team that included Defendants Jason Hill, Sgt. Babcock, CO Landridge, and CO McGuiness. Fischer and Babcock again tried to get Hewlett to come out of his cell, but he again refused. Hewlett explains that Fischer then began to fire pepper/OC balls into his cell with a paintball gun, but Hewlett had covered himself with a blanket, so it was ineffective. Fischer allegedly notified the team they would be entering the cell, but then he noticed Hewlett had tied the door shut with a sheet. By the time an officer returned to the cell with durashears to cut the sheet, Hewlett had tied up a blanket as a barrier, grabbed two bottles of Tylenol, swallowed the Tylenol, and thrown the empty bottles over the blanket partition toward the front of the cell. Hewlett explains that the entry team then entered the cell and easily took him to the ground because he offered no resistance. Dkt. No. 1 at 3-4.

Hewlett explains that his left hand was cuffed, but his right arm was tangled in the blanket. According to Hewlett, Hill was yelling at him to stop resisting and bending his left wrist. Hewlett

asserts that he explained to Hill that he was not resisting and that his arm was tangled, but Hill continued to bend his left wrist. Hewlett asserts that eventually officers were able to cuff both hands, but the cuffs were so tight that he was in pain and his fingers began to tingle and go numb. Hewlett states that he told the officers and supervisors about how tight the cuffs were, but no one addressed his complaints. He also states that during this time, even though he was compliant, Hill continued to bend his wrist and that he was in so much pain that he thought Hill was going to break his wrist. Hewlett explains that he was then taken out of his cell, with Bryant walking backwards in front of him. Hewlett asserts that he pleaded with Bryant to instruct her officers to stop hurting him, but she told him to keep walking. Babcock, Drover, and Fisher also refused to intervene and stop Hill from hurting Hewlett. Dkt. No. 1 at 4-6.

According to Hewlett, he believed his only option to stop Hill from hurting him was to abruptly plant his feet, which caused the officers behind him to slam into him. Hewlett asserts that his head and upper chest were over the range, and because of the force of the officers running into him, he vomited over the side of F-Range onto E-Range. Hewlett asserts it was hard to breathe, and Bryant had to direct officers to sit him up so he could breathe. Hewlett notes that Bryant had her taser in his face and asked him if he was going to stop resisting. Hewlett explains that he complied and was escorted downstairs where he was placed in a restraint chair. Dkt. No. 1 at 6-7.

Hewlett asserts that while being placed in the chair, he began to tell officers what they had done to him on the range. Hill allegedly yanked Hewlett's head back with his hands under his chin and over his nose and mouth. Hewlett asserts that he managed to yell, "Governor Evers banned all holds restricting breathing after George Floyd was murdered. What you are doing is illegal." According to Hewlett, Bryant then instructed Hill to remove his hands from Hewlett's mouth and nose. Hill allegedly then told officers to put a spit-mask on Hewlett, which Hewlett asserts was unnecessary and done only to demean him. Dkt. No. 1 at 7.

4

Hewlett explains that he was wheeled in the chair to the segregation unit, where he was asked if he would like to see a nurse. Hewlett refused, asserting that he would like to see an offsite doctor. Hewlett again asked that his handcuffs be loosened because his hands and fingers were numb. Hewlett asserts that his request was ignored. According to Hewlett, he was then wheeled into the strip cage where he was left for two hours until the third shift arrived. Hewlett asserts that nursing staff had informed Fischer that Hewlett could not refuse treatment at the prison and that he needed to go to the hospital because of the Tylenol he had swallowed, but Fischer ignored the nursing staff and left him in the strip cage for third shift to address. According to Hewlett, later that night, he was admitted to Waupun Memorial Hospital where he stayed for two days. Dkt. No. 1 at 7-9.

### THE COURT'S ANALYSIS

Hewlett seeks to bring multiple claims arising under the Eighth Amendment based on Defendants' alleged response to his threats of suicide, their use of force while transporting him to segregation, and their alleged deliberate indifference to his Tylenol overdose. First, Hewlett fails to state a claim against Ransbottom based on allegations that, despite Hewlett being suicidal, she briefly walked away from his cell to address another inmate. Although "[a]ll agree that suicide is an objectively serious medical condition," the Court cannot reasonably infer that Ransbottom was deliberately indifferent to the risk Hewlett posed to himself or that Hewlett suffered any injury as a result of Ransbottom's alleged actions. *Lord v. Beahm*, 952 F.3d 902, 904-05 (7th Cir. 2020). Ransbottom engaged Hewlett in conversation while Fischer organized a team to extract Hewlett from his cell. Her stepping away briefly to address another inmate who needed help does not demonstrate deliberate indifference to the risk Hewlett posed to himself. Given that Hewlett repeatedly refused to exit his cell and Ransbottom could not enter the cell on her own, her briefly

stepping away from the cell did not expose Hewlett to additional risk because she could do nothing to stop Hewlett from harming himself before the extraction team arrived.

The Court will, however, allow Hewlett to proceed on an excessive force claim against Hill based on allegations that he painfully bent Hewlett's wrist, refused to loosen handcuffs that were so tight they caused Hewlett's hands to tingle and go numb, and ordered Hewlett to be placed in a spit-mask for the sole purpose of demeaning him. *See Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004) (The "central question" when evaluating whether force used against a prisoner is excessive is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for c very purpose of causing harm.") (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Hewlett may also proceed against Langridge, Drover, Babcock, Bryant, and Fischer for failing to intervene after Hewlett allegedly informed them that Hill was hurting him and that the handcuffs were too tight.

Finally, Hewlett may proceed on a deliberate indifference claim against Fischer based on allegations that he ignored nurses' recommendations that Hewlett be sent to the hospital for his overdose and instead left him handcuffed in a restraint chair for multiple hours for third shift officers to address. An inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). As the Seventh Circuit noted, "That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007)).

Hewlett does not, however, state a claim against McGuiness, whose involvement was limited to videoing the extraction of Hewlett from his cell. *See* Dkt. No. 1 at 3. The Court cannot reasonably infer from the complaint that McGuiness used any force against Hewlett or that he had the opportunity or authority to intervene in others' use of force against Hewlett.

**IT IS THEREFORE ORDERED** that Hewlett's motion for leave to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**.

**IT IS FURTHER ORDERED** that CO McGuiness and CO Ransbottom are **DISMISSED** from this action because the complaint fails to state a claim against them upon which relief can be granted.

**IT IS FURTHER ORDERED** that pursuant to an informal service agreement between the Wisconsin Department of Justice and this Court, copies of Hewlett's complaint and this order are being electronically sent today to the Wisconsin Department of Justice for service on Jason Hill, Lt. Bryant, Lt. Fischer, Sgt. Babcock, Sgt. Drover, and CO Langridge.

**IT IS FURTHER ORDERED** that, pursuant to the informal service agreement between the Wisconsin Department of Justice and this Court, Jason Hill, Lt. Bryant, Lt. Fischer, Sgt. Babcock, Sgt. Drover, and CO Langridge shall file a responsive pleading to the complaint within **sixty days** of receiving electronic notice of this order.

**IT IS FURTHER ORDERED** that the agency having custody of Hewlett shall collect from his institution trust account the $322.53 balance of the filing fee by collecting monthly payments from Hewlett's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action. If Hewlett is transferred to another institution, the transferring institution shall forward a copy of this Order along with Hewlett's remaining balance to the receiving institution.

**IT IS FURTHER ORDERED** that a copy of this order be sent to the officer in charge of the agency where Hewlett is confined.

**IT IS FURTHER ORDERED** that the parties may not begin discovery until after the Court enters a scheduling order setting deadlines for discovery and dispositive motions.

**IT IS FURTHER ORDERED** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the Court to the following address:

> Honorable William C. Griesbach
> c/o Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 125 S. Jefferson Street, Suite 102
> Green Bay, WI 54301

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter.

Hewlett is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Green Bay, Wisconsin this <u>21st</u> day of December, 2022.

> s/ William C. Griesbach
> William C. Griesbach
> United States District Judge